## Street's Western Stable Car Line v. Louis Bonander.

97    601
100    [2]376
a196s   15

1. MASTER AND SERVANT—*Duties of the Servant.*—A servant is bound to exercise ordinary care for his own safety. He must notice dangers which are apparent but he need not hunt for hidden perils.

2. SAME—*Duties of the Master.*—The master is bound to exercise reasonable care to provide reasonably safe appliances for the use of his servant, and a reasonably safe place for the doing of his work, and the servant has a right to rely upon the performance by the master of this duty.

3. HAZARDS—*What Are Not Assumed by a Car Repairer.*—A car repairer in the employ of a company engaged in repairing cars does not assume the increased hazard which comes to him from his employer's foreman having notified the switchman of a railroad company to remove cars in bad order, nor the increased hazard which arises from the employes of such railroad company in proceeding to remove such cars without any notice that there were car repairers at work upon other cars on the same track, for whose safety, as a matter of common humanity, they ought to look out, and to whom they ought to give warning.

**Trespass on the Case,** for personal injuries.    Appeal from the Superior Court of Cook County; the Hon. Joseph E. Gary, Judge, presiding.    Heard in the Branch Appellate Court at the October term, 1900.    Affirmed.    Opinion filed November 1, 1901.

**Statement.**—Appellee, Louis Bonander, brought an action for personal injuries, by him sustained, at the trial of which a verdict was rendered against appellant for the sum of one thousand dollars.    From a judgment entered upon said verdict this appeal was taken.

Appellant, Street's Western Stable Car Line, is a corporation which owns a large number of stable or stock cars.    It neither owns nor operates a railroad, but leases these cars to different railroads.    Its place of storing these cars, when idle, is at the Union Stock Yards in Chicago; but while the cars are in service, they are temporarily stored in the freight yards of the various railroad lines that run into the city of Chicago.    The cars are kept in repair at all times by the appellant; and in order to do this, it is frequently necessary to make repairs on them in the switch yards and freight yards of the different railroad companies that use them.

Louis Bonander, appellee, on the 24th day of August, A. D. 1896, the day he received the injury, was by occupation a car repairer, and had been employed in this line of work by the appellant, continuously, for a period of between two and three years immediately preceding his injury.    During this time his services as car repairer were performed principally in the yards of the Chicago & Northwestern Ry. Co., working at times on the repair tracks where appellant's cars, which were in "bad order," were temporarily stored for the purpose of being repaired, and working during the other portions of his time in the switch yards of these railroad companies where cars of the appellant not in "bad order," but needing slight repairs, were temporarily placed awaiting their turn to be made up into trains for service by the switching crews of the railroad companies.    Plaintiff was injured while making slight repairs on cars standing on track 17 in the switch

yards of the Chicago & Northwestern Ry. Co.   While he was working, without notice to or knowledge by him, a Northwestern switch crew pulled twenty or more cars off this track.   At the immediate time of his injury he stood between two cars in a string of about fifteen cars standing on track 17.   At this place he was tightening a nut at the end of one of the cars between which he stood.   While doing his work, the switching crew of the Chicago & Northwestern Ry. Co. kicked a number (five to fifteen) of cars onto this track, and in so doing bumped the cars so kicked against the line of cars on which Bonander was working.   The movement which occurred in consequence of the bumping threw Bonander down, and one of his feet was cut off by the car wheels and his other foot injured.

In doing such light repair work on the switch yards, the car repairers were at all times subject to the danger of having additional cars thrown in against the string upon which they were working; and appellant claims the car repairers were required to work in pairs; that is, appellant claims two men worked together, so that when necessary one might watch out while the other performed work; and in doing repair work requiring going underneath the cars they generally alternated in the work of repairing and watching.   Two men would go to a string of cars, start in at the same end, taking opposite sides of the string, and examine them as they went along for light repairs, and when a nut was found loose it would be tightened, where it was missing a new one would be substituted, where a brake-shoe was displaced it would be adjusted, and other similar light repair work attended to.   Their duties were to ascertain what needed attention in the way of light repairs and, having so ascertained, give it the attention it needed.   At the time of the accident Bonander's partner was one Louis Erickson, an experienced car repairer.

The switch yard of the Chicago & Northwestern Ry. Co., in which they were then working, consisted of twenty-one parallel tracks, running east and west.   These tracks were straight, and the portion just then being used was about 1,400

feet long, or long enough to store about thirty cars, occupying forty feet each on any one track. At the west end of these tracks was a " lead track," running north and south. Each of the twenty-one tracks in the switch yard was connected with the lead track by an elbow or curve, which curve was about three rods in length. This piece of curved track enabled the switching crew to throw cars off any of the twenty-one tracks in the switch yard onto the lead track, where they could be taken away, or, *vice versa*, to return cars from the lead track into the switch yard where they might be made into trains. The west end of each of the twenty-one tracks in the switch yard was at all times open, so that cars might be thrown in or pulled out. In other words, it was never flagged, blocked or closed.

The following diagram of part of the switch yard shows the lead tracks and relative position of the twenty-one switch tracks and the place of the accident.

Street's Western Stable Car Line v. Bonander.

O. W. DYNES, attorney for appellant.

DOUTHART & BRENDECKE, attorneys for appellee.

MR. JUSTICE WATERMAN delivered the opinion of the court.

Appellee's insistence that the judgment in this case should be reversed is based, primarily, upon three contentions: First, that the injury to appellee happened from a risk by him assumed; second, that appellee was hurt in consequence of his own negligence or the negligence of a fellow-servant.

A servant is bound to exercise ordinary care for his own safety; he must notice dangers which are apparent, but he need not hunt for hidden peril.

The master is bound to exercise reasonable care to provide reasonably safe appliances for the use of his servant, and a reasonably safe place for the doing of his work. The servant has a right to rely upon the performance by the master of this duty.

The master must, to a reasonable extent, watch for and find that not necessarily obvious, while the servant can not overlook the apparent.

As is usual in personal injury cases, the evidence upon the trial of this cause was quite inharmonious.

There was evidence tending to show that appellant's foreman, upon the morning of the day on which he was hurt, told him to look out, as they were going to throw cars in there, and there was evidence tending to show that he merely told him to look out.

When appellee went to work there were upon the tracks of the Northwestern long strings of cars extending nearly up to the lead track. Appellee knew that he was working in a switch yard, a dangerous place, and that there was a possibility, if not a probability, that cars would be switched in and out of the yard.

When appellee went to work there were upon the track upon which he was injured, some twenty-five cars between the car upon which he last worked and the lead track. It is manifest that while these cars there remained, there was

comparatively little danger of the car upon which appellee was working when injured, being moved by the kicking of a car upon the twenty-fifth car from it.

Neither appellee nor Erickson appear to have had, prior to the injury, any warning that some twenty or more of the cars of this train had been pulled out, and that, a few "bad order" cars having been removed therefrom, the remainder were about to be kicked back upon the same track and so might strike with violence and move the car upon which he was working.    Nor does either seem to have had any warning that their foreman had told the switchman of the Northwestern, who had charge of the moving in and out of the cars upon these tracks, that there were bad order cars upon the track on which appellee was working, nor that consequently there would be a pulling out and throwing in of the cars on that track, in order to remove such "bad order" cars, and send them to the shop.

The switchman of the Northwestern road to whom information concerning these "bad order" cars was given by appellant's foreman, in order that such cars might be moved and taken to the repair shop, received neither information nor notice that there were any men at work repairing cars upon the track where these "bad order" cars were, and from which some twenty or more cars were pulled out and a number afterward kicked back.

Appellee did not assume the increased hazard which came to him from appellant's foreman having notified the switchman of the Northwestern to remove "bad order" cars, nor the increased hazard which arose from the employes of the Northwestern proceeding to do this, without any notice that there were men at work upon cars for whose safety, as a matter of common humanity, they ought to look out, and to whom they ought to give warning.

There was evidence tending to show that it was the custom of appellee and his fellow-servant, Erickson, to watch, one for the other, when either, in his work of repairing went under or between the cars.    And there was evidence tending to show that the custom was to watch

one for the other only when, in repairing, one went underneath a car. It did not appear that appellant had ever directed appellee not to go between cars save when Erickson was watching to see that no cars were moved upon the track on which appellee was working. Whatever usage there was in this regard was such as the workmen, of their own accord, had, while it did appear that sometimes they stood upon the top of the cars for the purpose of watching the movement of the trains on the lead and on the tracks.

So far as appears, neither appellee nor Erickson were sent there by appellant to watch. Their duties were to make light repairs upon the cars. If appellee was injured because Erickson failed to watch and warn him of what was going on, it was because of Erickson's failure to do that which he was neither employed to do by appellant, nor, so far as conclusively appears, undertaken by him as a matter of either agreement or custom between him and appellee.

Was the injury to appellee the result of his own negligence? Appellee was employed to work to repair cars, not to watch out for the movement thereof, although he was bound to take notice that cars might be moved and that there might be danger to him therefrom. He was injured, not from what was apparent to him, nor from the pulling of cars out from the track upon which he was working, but by the kicking of cars onto such track.

The switchman testified that his manner of throwing the cars back was:

"I cut the cars off and we pull the pin so that they will separate, and the engineer takes the slack out of the cars, and I give the engineer a signal and he will kick them or work the engine so as to give them momentum enough, so as to send them on the track where we wanted to get these cars in; and then I would give him a stop sign again, and that takes the slack out of them, and that is what we call kicking the cars in. The cars would be disconnected from the engine entirely. At the time we kicked these cars down, when appellee was hurt, he must have been about

twenty-five or thirty car lengths away from where we passed him."

He further said :

" The engine was on the lead; the lead curved off the track that appellee was on; the tracks run east and west and the lead runs kind of northwest, and then runs west again. We kick the cars of this lead; they ran about twenty-five or thirty car lengths."

The switchman testified that at this time there were cars on the tracks at both sides of the track that appellee was working on and that they filled such tracks clear up to the lead.

There was evidence tending to show that there was a space of about three and a half feet between the different lines of cars, and no obstruction in this passage.

Appellee testified that in doing this light repair work, such as fixing a nut, he was accustomed to jump in quickly and jump out again before any cars could come and hurt him; that he did not know that any cars had been pulled out of the track upon which he was working.

The contentions of appellant are as to questions of fact, all of which have been found against him. The verdict of the jury declaring appellee guilty of negligence, as charged in the declaration, having been approved by the trial court, we find in the record here presented no error such as requires us to set aside the judgment of the Superior Court, and it is therefore affirmed.