## Illinois Steel Co. v. John Mann.

1. EMPLOYER AND EMPLOYE—*When the Employe is Induced to Remain by Promises to Repair.*—Where the employer, on being notified by the employe of defects which render the service he is engaged to perform more hazardous, expressly promises to repair such defects, the

employe may continue in the employment a reasonable time to permit such repairs to be made, without being guilty of negligence, and if an injury results therefrom he may recover, unless where the danger is so imminent that a prudent person would not undertake to perform the service.

2. SAME—*What is a Reasonable Time, a Question of Fact.*—The question as to what is reasonable time for an employe to continue in the employment after promises to repair, before he assumes the risk incident to the defect complained of, is a question of fact for the determination of the jury.

3. SAME—*Reliance upon Promises Not to be Overcome by Matters Which May Create Suspicion of Danger.*—Where an employe has been assured from time to time that the defect complained of would be remedied, he has the right to rely upon such an assurance, and such reliance can not be overcome by matters tending to create a suspicion of danger.

4. SAME—*Employe Required to Take Notice of Obvious Danger.*—An employe must take notice of obvious dangers, but he is not under the necessity of hunting for them. It is the duty of an employer to find out defects which reasonable investigation will disclose.

5. SAME—*Employer to Furnish Safe Appliances and Surroundings.*— The burden is upon the employer to furnish reasonably safe machinery, appliances and surroundings, and the employe may rely upon the discharge of such duty by his employer.

6. SAME—*Duties Devolving upon Both Employer and Employe.*— The employer has the duty of inspection as well as of observation, while the obligation of the employe is that of observation.

7. SPECIAL INTERROGATORIES—*As to Evidentiary Matters.*—Special interrogatories should be direct, simple, plain, and not as to evidentiary matters.

8. DAMAGES—*Where $7,500 is Not Excessive.*—Where a man employed as a heater in a rolling mill was injured through the negligence of his employer, and his leg broken, a verdict, under the evidence, for $7,500, was held not to be excessive.

9. BURDEN OF PROOF—*Is upon the Party Asserting an Affirmative.*— The burden of proof is upon the party asserting a fact, to prove it.

**Trespass on the Case,** for personal injuries. Appeal from the Circuit Court of Cook County; the Hon. JOHN C. GARVER, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1900. Affirmed. Opinion filed February 21, 1902. Amended and refiled March 14, 1902. Rehearing denied.

This was an action on the case brought by appellee, John Mann, to recover damages for an injury suffered by him on November 17, 1892.

The case was tried upon the first and second counts of

an amended declaration. To these the defendant filed a plea of the general issue.

The first count of the amended declaration is to the effect that the defendant was the owner of a rolling mill; that the plaintiff was in its employ therein as a heater; that the defendant permitted the floor in front of the furnaces on which the plaintiff was compelled to stand and walk, while in the regular discharge of his duties, to become and remain in a dangerously broken, uneven, slippery and unsafe condition; that the plaintiff complained as to the dangerous and unsafe condition of the floor to the defendant; that the plaintiff was assured that the floor would be "fixed" very soon, in which assurance the plaintiff confided, and was thereby induced to remain in the discharge of his duties on said floor; that afterward, while working on said floor, the plaintiff fell down and broke his leg.

The second count of the declaration, after alleging the employment, etc., of the plaintiff, and the condition of the floors, sets forth that the plaintiff complained to a foreman of the defendant, and that this foreman promised the plaintiff that the floor would be fixed, in which promise the plaintiff confided, etc.

The case has been tried twice. Following the first trial there was an appeal to this court, where the judgment of the Circuit Court was affirmed, the opinion of this court being reported in 67 Ill. App. 66. Upon appeal to the Supreme Court the judgment of this and the Circuit Court was reversed, and the cause remanded. The opinion of the Supreme Court is reported in 170 Ill. 200.

The case was submitted to a jury, and resulted in a verdict against the defendant for $7,500, upon which there was judgment.

Kemper K. Knapp, attorney for appellant.

Phelps & Cleland and D. I. Jarrett, attorneys for appellee.

Mr. Justice Waterman delivered the opinion of the court.
That the floor upon which appellee was working when

hurt was not reasonably safe for the work which was being done upon it, has been specially found by the jury. Appellant urges that the principal question involved in this case is whether appellee was induced to remain at work upon this floor by promises of his employer that it should be repaired, and if so, whether he so remained more than a reasonable time for such repairs to be made.

Plaintiff testified:

"John Smith was the foreman of the mill. I had a conversation with him shortly before I was hurt in regard to the floor. I told him always to fix—to have it fixed when it was out of place, and he always had it fixed. He said he would have it fixed. The conversation which I spoke of was within two weeks before I was hurt. I had conversations on the subject of the floor previous to that time with Smith frequently. When I had the last conversation with Smith about the floor I didn't think it was necessary to quit work. I didn't see any immediate danger. I can not tell how many times during the last year I had conversations with Smith about fixing the floor. It was several. It had always been fixed previous to this time."

And on cross-examination: " I worked for five or six years. I made complaint from time to time for five or six years, whenever the plates would get out of shape, so that the buggies could not run off them, and that went on in that way for five or six years, and always in response to this complaint that was the way they would always fix them, by leveling up the plates. They never did take up the plates and cart them away and put new plates in their stead.

Q. Now, when you made these complaints during five or six years that you have been talking about, and they did not take away the smooth plates and the warped plates, why didn't you quit? A. I would see no danger in working on those plates.

Q. So that for five or six years you had been making complaints, and all they had been doing would be to level up the plates, and you never thought at that time of quitting the service on account of the fact that they did not put new plates in their place? A. I never thought it was too dangerous—to quit work.

Q. No? A. The plates looked sufficiently level to work on.

So far as I know they fixed that standing after that last

Illinois Steel Co. v. Mann.

complaint just the same as they had fixed them in answer to my complaints for the five or six years that I had been complaining.    I was not there to see whether they fixed it or not, but it was in bad condition the day I got hurt.

During the five or six years when I made complaint they fixed it when they got an opportunity to fix it.    They could not always fix it in a moment.    It is a difficult matter to fix a standing while there are cold buggies running for three furnaces and two other hot buggies going.    They had twenty minutes for dinner.    During that twenty minutes they could not level up the standing very well, because this buggy—as soon as it was out they wanted them to bring cold steel right in over my standing and charge it up again. They could run cold ingots right over my stand and put into that furnace that I have just been talking about. They could do it if they seen proper, in the evening.    He wouldn't stop the work to fix it.    He could do it on a Sunday without stopping the work.

Q.    Sometimes you say they did not fix it right quick, right promptly, during this five or six years that you were complaining—immediately after you complained?    A.    No, of course they wouldn't.

Q.    When they didn't do it promptly, you didn't quit, did you?    A.    No, it was not bad enough to make anybody believe that they could get hurt on it.

Q.    And didn't think there was any danger connected with working on that thing?    A.    I didn't think of any danger.

Q.    It was not considered among you men there as being dangerous, so that you ought to quit if it was not safe?    A. I couldn't see any immediate danger on it.

Q.    So if Smith had told you this last time in answer to your complaint, that he could not fix it, or would not, you would have kept on working just the same?    A.    I don't know about that.

Q.    You can't say that you would have quit?    You never quit before?    A.    They always fixed it before.

Q.    But you say sometimes he did not fix it for a long time.    A.    He would not fix it on the moment.

Q.    And you didn't quit?    A.    But he would fix it; it was not sufficiently bad for me to quit.    It would be sufficient to have the buggy to get away from the furnace; that is the idea.    It would not be so bad but what I could work on it, but it would be so bad that the buggy-man could not get the buggy away from the furnace and caused me to

take a paddle and go to the hot furnace and pry that buggy out of the hole and burn my brains out.

Q. Then the complaint you made to Smith was because it made it difficult for you to get an ingot up to the furnace, and not because you thought it was dangerous? A. Not because it was dangerous for me.

Q. But it was because you did do your work better if that was perfectly level in getting the ingot up to the furnace? A. Still, at the same time I was in danger and might not realize it. Buggies ran over one of those plates and hoist it up on the side I was standing, and pushed the other side down; then I was in danger, and didn't know it. I wanted it level.

Q. You wanted it level so that you could do your work there? A. Yes, sir.

Q. You didn't tell him that you wanted it level so as to make it safe for you, did you? A. I wanted it so that I could work on it. I always told him that I wanted it fixed so that I could put the buggy up there and *make it safe to stand on.* I wouldn't say any immediate danger, of course not. I could do my work better on a level.

Q. You did not complain to Smith at any time that the floor was dangerous for you to work on? A. No, I don't think I ever put the question to him. I never said anything about the buggy. The reason that I wanted it fixed was partly so that we could get the buggy up to the furnace and my own convenience. Do it with safety anyhow. When my work was done, it was better work on a level. It was more convenient, is what I mean when I say it was better. I want to be understood that at that time I didn't think there was any immediate danger from that floor while I was working on it. Of course it was dangerous. When I would go to work Monday morning it looked level and looked all right, but during the week these things occur. I didn't handle the buggy. I wanted it fixed for my own convenience. It was dangerous at the time I spoke to him. I did think it was dangerous at that time. It didn't look dangerous when I came to work the morning of my injury.

Q. Did it grow more dangerous during that day? A. It did so.

Q. Then at the morning of the day of the accident it was not dangerous, but it became dangerous during the day; is that right? A. It was dangerous or else I could not have got hurt on it.

Q. And it was not dangerous when you came on that

morning? A. Certainly it was dangerous, but you could not see the danger. No reasonable person would see the danger that was there to look at it.

Q. You didn't think it was dangerous that day? A. No, sir, I didn't see any danger ahead of me.

Q. Then, at none of these times that you made the complaint to Smith, did you think it was dangerous? A. It needed fixing, leveling up.

Q. But you didn't think it was dangerous? A. No. I didn't think it was really dangerous. I saw no imminent danger there.

Q. You saw no more danger in connection with this floor the day of the accident than you did any other time when you made complaints? A. Not that I could see.

Q. But there were none of these other times that you made complaint that you thought it was any more dangerous than it was the day of the accident; is that true? A. Oh, yes, I had seen it in worse condition.

Q. More dangerous to a man working on it? A. Yes.

Q. But those times, as I understand you, you never complained to Smith that it was dangerous for the man to work on it; you never told him it was dangerous? A. That I couldn't say.

Q. What was the condition of the floor at the time you made the last complaint? A. It was uneven.

Q. At the time you made the last complaint you did it because the floor was uneven, and it made it difficult for you to get the buggy up to the furnaces? A. Yes, and made it uncomfortable all around.

Q. But at that time, the time you made the last complaint, you didn't see any immediate danger there in your working upon the place? A. I was working that day myself.

Q. You didn't see that there was any immediate danger? A. I have worked on that standing for years, and it would get out of repair and rise up and get out of repair and rise up again. Why would I see any immediate danger? but it was there all the same.

At the time I slipped, my feet were in the vicinity of the middle one of these plates. The middle of these plates were a little higher than the edges. The middle of the plate was worn smooth. The plate made me slip because there was a bulge in the middle, and because the lower edge of the plate was lower than the one behind me, and that made it still worse. The edge of the plate next to the

furnace was low. That would be the north edge. I was standing somewhere in the vicinity of the middle of the plate. The edge of the plate was down and my face was that way. I had hold of my paddle in this form and I went to lay that down, and just as I made the motion my heels went out from under me. The plates where I stood were not covered with snow or ice at the time. They were not covered with water at the time. The plate was dry on top."

Under the evidence tending to show that within two weeks before the accident the defendant promised plaintiff that the floor should be fixed, it was a question of fact for the jury whether, in continuing at work such two weeks, appellee remained a longer time than was reasonably necessary for the "fixing" of the floor. There is nothing in the record warranting our reversal of the conclusion of the jury as to this.

"Where the master, on being notified by the servant of defects that render the service he is engaged to perform more hazardous, expressly promises to make the needed repairs, the servant may continue in the employment a reasonable time to permit the performance of a promise in that regard without being guilty of negligence, and if any injury results therefrom he may recover, unless when the danger is so imminent that no prudent person would undertake to perform the service." Missouri Furnace Co. v. Abend, 107 Ill. 44; Cooley on Torts, 559; Wharton on Negligence, 220; Holmes v. Clark, 7 Hurlstone & Norman, 348; Clark v. Holmes, 7 Hurlstone & Norman, 937; Drop Forge & Foundry Co. v. Van Dan, 149 Ill. 337–342.

The facts of the present case are similar to those under consideration in Weber Wagon Co. v. Hehl, 40 Ill. App. 584, and 139 Ill. 644.

The accident out of which that case arose was caused by the condition of a floor upon which the injured party worked, of which he had complained, and to whom promises to repair had been made. In that case the Supreme Court said:

"If the plaintiff had been assured from time to time that the floor would be fixed, he had a right to rely upon such assurance, and such reliance could not be overcome by a fact or facts which might create suspicion."

It is urged that the plaintiff can not recover because he did not in such terms inform his employer that the floor was dangerous.   We have been referred to no case holding that the notification must be in such language or necessarily to that effect.   The plaintiff did tell the defendant that he wanted the floor fixed so that it would be safe for him to stand on.   A servant must take notice of obvious dangers but he need not hunt for them, while a master must find out imperfections which reasonable investigation will disclose.

Constant presence chills the sense of danger; habitual association with, renders men oblivious to it.   The floor was not in proper condition.   The description of it was such that a novice, one unaccustomed thereto, would probably have walked carefully and hesitatingly thereon.   We regard the complaint of the pointing out of its defects and the promise that it should be " fixed " as sufficient to warrant the jury in finding, as it did, that plaintiff did not assume its hazard by continuing at work for the length of time he did.

Counsel urge that the floor was not dangerous; if this be the case, further discussion is unnecessary.

. The plaintiff has recovered judgment and can have it sustained only upon his claim that the floor was dangerous.

We are of the opinion that the jury were, by the evidence, warranted in finding that this floor was dangerous.

At the instance of the defendant the jury were instructed to answer the following special question :   " Was the floor at the place where the plaintiff was injured reasonably safe for the work which was being " done upon it at that time ? To which the jury answered " No."

At the instance of the defendant the jury were instructed to answer the following question:   " Did the plaintiff at any time before the accident complain to Smith, an employe of the defendant, that the floor at the place of the accident was in such a condition as to be dangerous to him ? "   To which the jury answered " Yes."

Appellant insists not so much that the place was not

dangerous, as that nobody thought it was; and that, consequently, no one could have complained of danger and there could not have been any promise to remove the danger or any waiting a reasonable time for this to be done.

At the instance of the defendant the court instructed the jury to answer the following : " Was the floor at the place of the accident such that a reasonably prudent man would, at the time of the accident, have refused to do the work upon it which the plaintiff was doing at the time of the accident ? " To which the jury answered " No."

Appellant having obtained from the jury answers to special questions propounded at his instance, can not now dispute the correctness of the replies. Notwithstanding this, there remains the question of whether the danger was one which the master ought to, or is presumed to have known.

A servant must take notice of obvious material conditions and of obvious danger, but he is not obliged to look for these; while the master must ascertain material conditions and danger which can be found by the exercise of reasonable diligence.

The burden is upon the master to furnish reasonably safe machinery, appliances and surroundings; and the servant may rely upon the discharge by the master of his duty in this respect. C. & E. I. R. R. Co. v. Hines, 132 Ill. 161; Goldie v. Werner, 151 Ill. 551; Same v. Same, 50 Ill. App. 297; C. & E. I. R. R. Co. v. Kneirim, 152 Ill. 458; Illinois Steel Co. v. Schymanowski, 162 Ill. 447; Same v. Same, 59 Ill. App. 32; Western Stone Co. v. Muscial, 96 Ill. App. 288; Illinois Steel Co. v. Mann, 170 Ill. 206; Bailey on Master's Liability for Injuries to Servant, 109–110–111–112–122–123–124–125; Street's Western Stable Car Line v. Bonander, 97 Ill. App. 601.

In other words, the master has a duty of inspection as well as of observation; the obligation of the servant is that of observation. Bailey on Master's Liability, etc., 93–100–107–108.

We have here a case in which, in addition to the general finding by the jury that the defendant is guilty of the neg-

ligence charged in the declaration and that the plaintiff was injured thereby, the special findings, given upon the request of the defendant, are that the floor at the place where the plaintiff was injured was not reasonably safe for the work then being done upon it, and yet was not in such a condition that a reasonably prudent man would have refused to do the work which the plaintiff was doing upon it, and that the plaintiff had before the accident complained to the defendant that the floor was in a dangerous condition.

The general verdict is to the effect that the defendant had promised to repair this floor. It thus appears that a question presented in this case to this and the Supreme Court on a former occasion is again here, viz.: Did the plaintiff, after the promise of the defendant to repair, remain at work for a greater time than was reasonably necessary for repairing the floor; that is, for making it reasonably safe?

The Supreme Court reversed the judgment of this and the Circuit Court solely because, upon what is meant by "a reasonable time," the jury were, before, wrongfully instructed. We regard the judgment and opinion of the Supreme Court as practically disposing of the claim that the declaration does not state a cause of action.

The defendant asked that the jury be directed to answer fourteen special questions. The court required the jury to, and it did, answer three of these.

Among those which the court refused to submit was the following:

"If you find that the plaintiff complained to the defendant's foreman, Smith, about the condition of the floor, and that said Smith promised to repair said floor or to remove the defects in said floor, was there thereafter, and before the time of the accident, reasonable time for such repairs to be made or defects remedied?"

Practically three questions are thus asked under the guise of obtaining an answer to one. Questions should be direct, simple, plain, and not as to evidentiary matters. C. & N. W. Ry. Co. v. Dunlevy, 129 Ill. 133–146; T. H. & Ind. R. R. Co. v. Voelker, 125 Ill. 540.

Moreover, the evidence showed that the plaintiff had for five or six years been making complaints about the condition of the floor, and the defendant had been promising to fix it and fixing it.

To which of these requests and promises did this question apply?

Counsel for appellant in his brief says:

"For all that appears in the declaration the floor may have been fixed after the promise, and again become out of repair. This is especially important in view of the evidence in the case which tends to show that the floor was fixed after the alleged promise, and that it became worse again during the day upon which the plaintiff was injured."

A complaint and a promise to repair having very recently been made, if before the accident there were repairs, we think that the plaintiff had a right to believe that they were of such a nature that the floor would not be again in a dangerous condition within less than two weeks. The defendant knew the character of the repairs it had made and how long they were likely to last; it was bound to find and know of such defects, as by reasonable diligence it could ascertain.

The jury have found that at the time of the accident the floor was not in such a condition that a reasonably prudent man would have ceased to work there. The statement of the case made upon the formal trial, as reported in 170 Ill. 200, is not essentially variant from the case shown by the record and abstracts of the last trial. As to the former trial the Supreme Court mention but one error; this, taken in conjunction with the dissenting opinion, leads us to the conclusion that the Supreme Court would, but for the error mentioned by it, have affirmed the former judgment. It is very clear that the Supreme Court must have considered that there was evidence tending to sustain the verdict of the jury that there was a promise to repair; else the court would not have reversed upon the correctness of an instruction concerning the reasonable time which the plaintiff might wait for the making of such repairs.

It is said that the promise to fix the floor meant only that

it should be leveled up. We can not assent to 'this. The station in life, the ordinary habits and speech of workmen who make complaints of conditions, and those who make reply thereto, must be taken into consideration. These persons were not lawyers, nor were they seeking to make a contract or prepare for a lawsuit. The plaintiff spoke as laboring people do, plainly; clearly conveyed a complaint that the floor was out of order, and asked to have it fixed; and as plainly was told that it would be fixed. If leveling up was all that was needed, then that was all asked for and promised. The verdict of the jury is a finding that fixing meant putting it in such condition as was required for the reasonable safety of the plaintiff while working thereon.

The testimony of the plaintiff that the condition of the floor would make a man more liable to slip was admissible, if that was a matter concerning which expert evidence was necessary.

The description of the floor showed that one would be more liable to slip and fall thereon than upon one that presented an even surface. The opinion of the witness added nothing to the force of the statement of the condition of the plate whereon appellee continued at work under promise that it should be fixed. There was no dispute as to the condition of the floor, no denial of the plaintiff's testimony of the promise made to him, nor of the specific language testified to have been used in making the promise; that the promise was also sometimes stated in words implying a conclusion of the witness, did no harm.

It is urged that the court should have required the jury to answer the following question, as requested by the defendant:

"If you find that the plaintiff complained to the defendant's foreman, Smith, about the condition of the floor at the place of the accident, and that said Smith promised to repair said floor, or remedy the defects therein, does the preponderance of the evidence show that the plaintiff would have quit the service of the defendant, before the time of the accident, if the said Smith had refused to repair said floor or remedy defects therein, as aforesaid?"

What plaintiff would have done, if certain things had occurred, was not at issue in the case, and this request was properly denied.

We think that the court submitted to the jury all the special questions it was bound to.

Appellant best knew as to the time it would have taken to fix the floor, and the burden of proof was upon it to show that the floor could, reasonably, have been fixed after the promise, and before the accident; it introduced no evidence as to this.

Upon him who asserts a fact is the burden of proving it. Wharton on Evidence, Sec. 354.

The declaration states a cause of action, and the verdict is not, under the evidence, excessive.

Finding no errors warranting a reversal of the judgment, it is affirmed.