## Julia Miller and Thomas F. Hunt, Administrators, Appel= lees, v. Kenwood Bridge Company, Appellant.

## Gen. No. 16,078.

1. INSTRUCTIONS—*when containing abstract proposition of law will not reverse.* If an instruction correctly states an abstract proposition of law applicable to the case it will not reverse unless it appears that it was calculated to mislead.

2. MASTER AND SERVANT—*how question as to safe place determined.* Held, that under the evidence it was for the jury to determine whether the master had fulfilled his duty, which duty the master could not delegate, to use ordinary care to furnish a reasonably safe place for the plaintiff's intestate to work.

3. MASTER AND SERVANT—*respective duties of.* With respect to the place where a servant is required to work the duty of the master is that of inspection, the duty of the servant is that of observation.

Action in case for death caused by alleged wrongful act. Appeal from the Superior Court of Cook county; the HON. WILLARD M. MC-EWEN, Judge, presiding. Heard in this court at the October term, 1909. Affirmed. Opinion filed April 1, 1912.

CHARLES C. ARNOLD, for appellant.

McCASKILL and SON, for appellees.

MR. PRESIDING JUSTICE BROWN delivered the opinion of the court.

The plaintiffs (appellees) in this cause obtained in the Superior Court a judgment for the benefit of the "next of kin" under the "Campbell" Act of Illinois, on March 19, 1909, for $4000 against the defendant company (appellant) for causing by its negligent default the death of their intestate, Jacob Miller.

The defendant corporation has a manufacturing plant at Grand Crossing near Chicago. In its business it manufactures steel and iron girders for bridges. Jacob Miller at the time of his death, February 15, 1907, was employed by it, and was at work with two other men "fitting up" a bridge girder weighing 3000 pounds, sixteen feet long, four and a half feet high, and with a flange six and a half inches wide. He was fifty-three years old and had been a teamster up to about three weeks before his death.

"Fitting up" a girder consisted in assembling the parts of which it was to be constructed, fitting them together and bolting them in place ready to be riveted. The work was done on a skidway consisting of two wooden beams twenty feet long, blocked underneath and having railroad rails on their upper surface. The "fitting up" was done on one end of this skidway and the riveting of the same girders near the other end.

The "fitting up" gang handed its completed work over to the riveting gang by moving the girders when fitted up along to the middle of the skidway, from which place the girders were taken by the riveting gang. The girders in process of fitting up in their removal to the place where they stood until the riveters were ready to work on them, and in their removal therefrom by the riveting gang, were moved by means of a compressed air hoist suspended from an overhead trolley. Each gang used the hoist as it needed it, passing it from one to the other as occasion demanded.

On February 15th Jacob Miller was at work on one of these girders set up on edge about three feet away from five or six other girders, also set up on edge close to each other and between him and the riveting gang, which had been fitted up ready for the riveters. Suddenly these girders began falling and Miller was caught under the one at which he was working, which had been struck by others as they fell. Another of the gang of three was also thus caught, and both were almost instantly killed.

The plaintiffs' declaration in some counts complained that the defendant so placed the girders mentioned that they were liable to topple over unless braced, and that it was by reason of the want of bracing that they fell over and killed the plaintiffs' intestate; in others, that the defendant so negligently moved a girder that it came into contact with the girders that fell, and by falling caused the death of Miller; and by the final count that the defendant negligently directed Miller to work in an unsafe and dangerous place.

After the accident one girder was found to be suspended from the hoist near the riveters' end of the skidway and immediately next to the first girder that fell. It is the plaintiffs' theory of the accident that the riveters in hoisting this girder for transportation

to another part of the shop accidentally allowed it to strike against the girders standing on edge and unbraced, and that they fell against each other like cards in a falling card house, until the impact reached the one which fell on and killed Miller and his companion. The evidence showed that it was customary to brace the girders to prevent their falling over when that seemed necessary, and in such case 4 by 4 timbers were used, obtained from a pile in the yard. It showed also that a gang of riveters had been working on the morning of the accident on the other side of the girders that fell and about twelve feet away from them, but failed to show directly whether or not they were at work there at the precise time of the accident.

The gang of fitters consisted of three men—Miller and the other man who was killed by the accident, and one Michael Lay, who was described as a "fitter up," the other two men being known as "helpers." The foreman of the shop at the time, testifying for the defendant, described the "fitter" as the man who could read the blue prints "and knew how to put up the work" and that "his work was to see that the work was done right and tell the two helpers what to do." The riveting gang, in which there were four men, was similarly organized, one man—in this case named O'Brien—running the riveting machine and being in charge of the others and telling them what to do.

The main reliance of the appellant in its attempt to reverse this judgment is placed on the contention that it was the duty of the trial judge at the close of the evidence to take the case from the jury by a peremptory instruction to find for the defendant. This is based on the positions that the accident was one the risk of which was assumed by the plaintiffs' intestate, and that if it were the result of negligence at all, which it is claimed was not proven, it was the negligence of fellow servants of the deceased, and that both these matters—the application of the assumption of risk

doctrine and of the fellow servant doctrine—were in this case matters of law for the Court, instead of fact for the jury, because the evidence precluded the possibility of reasonable men reaching differing conclusions thereon.

It is, however, suggested by appellant that the damages are in any case excessive. We do not think the verdict one which we should disturb on this ground.

It is also contended that the first instruction given was erroneous. It is as follows:

"The Court instructs the jury that it is the duty of a master to use ordinary care to furnish his servants a reasonably safe place in which to work, and this is a duty which he cannot delegate to another."

We do not think this instruction was erroneous nor misleading. It states an abstract proposition of law, but it was one applicable to this case and we think might well be controlling in the disposition of it.

It was, in our opinion, a question for the jury whether the place at which Miller was required to work on and about the girder which he was fitting up, was reasonably safe while the half dozen other girders were standing unbraced on their edges in such juxtaposition and at such spaces from each other that the fall of the farthest one would cause the girder on which he was working also to fall, and while at the same time, according to the usual custom of the work, a distinct gang of other workmen on the other side of the barricade formed by these standing girders, were using from time to time an air hoist, passing back and forth at times from one to the other gang and swinging up from the riveters' side these ponderous pieces of iron while the "fitter" and his helpers were at work on their side.

It was also, in our opinion, a question for the jury whether the master, in view of the conditions named, fulfilled the duty (which it could not delegate) to use ordinary or reasonable care to furnish a reasonably

safe place for its servant to work. The Company must, it seems to us, be held to have undertaken to discharge this duty, so far as it undertook it at all, through the "straw bosses" of the fitting and riveting gangs and not through their helpers, who were to work where and as their leaders directed. Schilling & Bros. Co. v. Smith, 225 Ill. 74.

The space between the girders standing on edge was an important factor in this matter. Had there been not so much, or more, the accident would not have happened as it did.

Care in placing the surroundings of Miller's necessary work and inspection afterward were the duties the master. Observation only was the obligation of the servant. Illinois Steel Company v. Mann, 100 Ill. App. 367.

We do not think that it could be said in this case, as it was in the case of McCormick Co. v. Zakzewski, 220 Ill. 522, relied on by the appellant, that the conditions of danger were shown to be open, apparent and known to the servant. The case is more like Armour v. Golkowska, 202 Ill. 144, where the Supreme Court decided that the question whether there was want of reasonable care on the part of the master in neglecting to place on a platform a barrier which would have prevented an entirely unexpected and apparently unlikely fall of a barrel upon the head of the plaintiff, was of fact for the jury and not of law for the Court (p. 147); and also (p. 147) that if the fall of the barrel was occasioned by the negligence of a fellow servant, combined with a neglect of duty by the master, the master was liable, and, further, (page 150) that "on entering the service of the appellants the appellee had the right to assume that the place provided by them in which she was to do their work was reasonably safe, and that they would exercise reasonable care to maintain that condition of safety;" that "the duty which the master owes to his servant to provide a reason-

ably safe place wherein the servant is to work is a positive duty devolving upon the master and is not one of the perils or risks assumed by the servant;" and that it was (page 151) "a question of fact, not of law, whether the injury received by the appellee was occasioned by or through a peril of her employment, the risk of which she had assumed."

We think that the "fellow servant" doctrine is not really involved in this cause. If it were, it made a question of fact for the jury. In any event the jury, we think, were properly instructed both on that subject and on that of the "assumption of risk" which was involved, but which was also a question of fact for the jury.

The instruction numbered fifteen, tendered and refused, was properly refused. So far as it was correct it was covered by instructions which were given, and its phrasing seems to us to have rendered it likely to be misleading.

The verdict was not, in our opinion, contrary to the weight of the evidence, and the judgment of the Superior Court is affirmed.

*Affirmed.*