## John J. Purtell, Appellee, v. Philadelphia & Reading Coal & Iron Company, Appellant.

## Gen. No. 15,965.

1. NEGLIGENCE—*when invitation to enter premises established.* *Held,* that under the particular custom in question in this case and the knowledge thereof by the defendant established by the evidence, there was an implied invitation to the plaintiff to be upon the premises at the time of his injury and that in consequence the defendant owed to such plaintiff the duty to exercise ordinary care.

2. NEGLIGENCE—*leaving machinery unsecured.* *Held,* under the evidence, that it was negligence to leave, in a high wind, a block and boom, attached to a derrick, so unsecured, that they were likely to swing out over a considerable arc and do injury to a servant while in the performance of his duty.

3. MASTER AND SERVANT—*when declaration need not negative injury by fellow-servants.* If a declaration is predicated upon the failure of a master to perform a non-delegable duty, it is not essential that such declaration allege that the injury was not the result of the negligence of a fellow-servant.

4. MASTER AND SERVANT—*when latter not obliged to inspect.* It is not required that a servant inspect a place at which he is assigned to

work.     The duty of the master is inspection; that of the servant is merely observation.

5.  CHILD LABOR LAW—*what "a manufacturing establishment, factory or workshop" within the meaning of the Act of 1897.*  Held, that the yard in question in this case, was "a manufacturing establishment, factory or workshop" within the meaning of the Child Labor Law of 1897.

6.  CHILD LABOR LAW—*what in force.*  Held, that the 8th section of the Child Labor Law of 1897 is still in force notwithstanding the Revisory Act of 1903, and that said section still applies as ·furnishing a definition for what is "a manufacturing establishment, factory or workshop" within the meaning of such Revisory Act of 1903.

7.  CHILD LABOR LAW—*effect of Act of 1903.*  The evident purposes of the Act of 1903 are better to define the extra-hazardous occupations from which by the Act of 1897 the legal employment of youths between 14 and 16 were withdrawn, to provide further conditions in the nature of prior school attendance and teaching in case of the employment at all of such persons, to shorten the hours allowed for children's work, and to provide more efficient machinery for.the enforcement of the act.  The Act of 1903 was in nowise intended otherwise to repeal or conflict with the law of 1897, and while expressly repealing a Child Labor Act of 1891, it does not mention the Act of 1897.

8.  CHILD LABOR LAW—*what not essential to enforcement in personal injury case.*  In order to bring a case within the provisions of the Child Labor Law it is not essential that the relation of master and servant existed between the child injured and the defendant, at the time of the injury.  It is sufficient if the child was permitted or suffered to be in a "manufacturing establishment, factory or workshop" of the defendant.

9.  CHILD LABOR LAW—*duty to ascertain age.*  Once the knowledge, permission and approval of the owner of premises as to the presence of a child on its premises and his labor thereon in a gainful occupation are established, the age of the child becomes a matter which such owner must ascertain at its peril.

10.  STATUTORY LAW—*rule of construction.*  "Words in a subsequent Act are to be given the recognized meaning they had in a former Act *in pari materia* in the absence of anything to show a contrary intent."

11.  TRIAL—*when denial of continuance will not reverse.*  The denial of a motion for a continuance predicated upon surprise resulting from the permitting of an amendment will not reverse in the absence of an abuse of discretion being established.

Action in case for personal injuries.  Appeal from the Circuit Court of Cook county; the Hon. RICHARD S. TUTHILL, Judge, presiding.  Heard in this court at the October term, 1909.  Affirmed.  Opinion filed February 5, 1912.  Rehearing denied February 19, 1912.

Purtell v. P. & R. Coal & Iron Co., 167 Ill. App. 125.

UHLMANN, HOAG & DAVIDSON, for appellant; PARKER H. HOAG, of counsel.

FRANCIS J. WOOLLEY, for appellee.

MR. PRESIDING JUSTICE BROWN delivered the opinion of the court.

This appeal is from a judgment of the Circuit Court of Cook county for $20,000 in favor of John J. Purtell, a minor (twelve years old when the suit was brought in 1904) against the Philadelphia & Reading Coal & Iron Company. The judgment was rendered on the verdict of a jury in a personal injury suit. When the trial began on May 12, 1909, one Michael M. Connery was also a defendant. The pleadings in behalf of the plaintiff then consisted of three counts of a declaration. The first of these—which for convenience in this opinion and to avoid any confusion springing from the elimination of some and the amendment of all of the counts in the original declaration—we shall call count A., averred that on October 8, 1903, the defendant, the Philadelphia & Reading Coal & Iron Company, was engaged in the business of dealing in coal and was possessed of a coal yard and of a derrick with a boom and tackles attached, and had in its employ in this yard coal heavers to unload coal; that the defendant, Michael M. Connery, was in the employ of the Company as superintendent and foreman of the yard and dock and in charge of all the appliances therein, including the derrick, boom and tackles, and in charge of the coal heavers; that the derrick, boom and tackle were so arranged that unless they were secured with reasonable care in some one place they were liable, when not in use, to swing and blow about their central points over a wide space and strike any person who might be near; that the plaintiff Purtell was then employed as a water boy in the Company's yard by the

coal heavers in the yard to carry water to them while they were at work in the said yard for the defendants; that the employment of the plaintiff by the coal heavers was with the knowledge, consent, permission and approval of the defendants; that in view of the nature of the employment it was reasonably necessary and for the benefit of the defendant's business that the plaintiff or some other person should be employed to supply the coal heavers with drinking water; that the plaintiff was eleven years and eleven months old, that is, of tender age, as the defendants and each of them by due care would have known; that by virtue of the premises it was the duty of the defendants to use due care to furnish the plaintiff a reasonably safe place in which to perform his work; that nevertheless "the defendants and each of them carelessly and negligently suffered the said derrick, boom and tackles, which were not then and there in use for hoisting, to remain not reasonably securely tied or fastened, but on the contrary fastened insecurely with a weak, insecure, worn out and rotten fastening, which was very liable to become loose at any time, so that the said derrick, boom and tackle were liable to swing about their central points * * * so that the said yard became and was a place not reasonably safe for the minor plaintiff to work in;" that the defendants by due care would have known the condition of the said derrick, boom and tackle in time by due care to have prevented the injury to the plaintiff, but that the plaintiff, by reason of his inexperience and tender years was unaware of and did not appreciate the risk of injury; that by reason of the negligence of the defendants the plaintiff, while he was with all due care and diligence at work at his employment in the yard, was struck by the derrick, boom and tackle, which came loose and swung against him and he was thereby injured.

The second of the counts on which the case was tried we shall denominate count B. This count averred the defendant Company was engaged in the business of dealing in coal and was possessed of a certain "manufacturing establishment, factory and work shop, to-wit, a certain coal yard and dock in which coal was cleaned, sorted, stored and packed by it for sale and not for the personal use of the defendant;" that in the said yard and dock the defendant was operating high trestles with cars running thereon, for the purpose of distributing coal about the yard, and derricks, booms, tackles, hoisting buckets and other appliances for unloading coal from boats and steamers; that Connery was the superintendent and foreman and in charge of the appliances and in charge of the servants of the defendant in the yard and dock; that by reason of the cars, which in the course of defendant's business were frequently moving about the yard and dock and upon the trestles, and by reason of the high trestles and the derricks, booms, tackles and buckets which were swinging about the said yard very frequently, the employment in and about the said yard or dock of any child of tender years was very dangerous to the life or limb of such child,—all of which the defendants would by due care have known; that nevertheless the defendants "carelessly and negligently suffered and permitted the minor plaintiff, who was then and there a child under the age of fourteen years, to-wit, of the age of eleven years and eleven months, to work in the said manufacturing establishment, factory and workshop, to-wit, the said yard or dock, at a certain gainful occupation, to-wit, as a water boy, to carry drinking water about the said yard, docks and trestles and among the said moving cars, derricks, booms, tackles and buckets, contrary to the terms of the statute of the State of Illinois in such cases made and provided;" that the defendant Company had, in time to prevent,

by due care, the injury to the plaintiff, notice by and through its manager, superintendents and foremen, who were in charge of the work in said yard (of whom Connery was one), both that the minor plaintiff was under the age of fourteen years, and also that he was at work as aforesaid about the said yard, dock, trestles, derricks, booms and buckets; that by means of the negligence of the defendants and each of them, the plaintiff, while with all due care he was in the yard and dock for the purpose aforesaid, was struck by a portion of said moving derricks, tackles and buckets and thereby injured.

The third of the counts above mentioned we will call count C. It was practically identical with count B., except that instead of alleging that the defendant Company was possessed of "a certain manufacturing establishment, factory and workshop, to-wit, a certain coal yard and dock," it alleged that the Company was possessed of "a certain mercantile institution, to-wit, a certain coal yard and dock."

To this declaration each of the defendants, the Philadelphia & Reading Coal & Iron Company and Michael M. Connery, pleaded the general issue of "not guilty."

After the evidence for the plaintiff had been heard the defendant, Philadelphia & Reading Coal & Iron Company, moved the court for a peremptory instruction to find it not guilty. After argument on this by counsel for each party (during the course of which the plaintiff's counsel stated that there seemed to be no evidence against the defendant Connery, but declined to dismiss as against him, on the ground that it would make the cause immediately removable to the Federal Court), and before the court had announced his decision on the motion for a peremptory instruction, counsel for plaintiff obtained leave to, and did, amend each of the three counts,—A., B. and C.—by dropping from each of the allegations that Michael M. Connery

was "superintendent and foreman," having in charge the appliances and servants of the defendant Company, the words "and foreman," and adding to each of said allegations the words "and one Humphrey McCarthy was then and there in the employ of defendant as foreman of the said yard under the said Connery."

In asking for leave to make the amendment counsel for plaintiff stated that it was to meet a point made by the defendant that the plaintiff's proof varied from the declaration. "I do not think the point is good," he said, "but I don't want to take any chances on it."

On the making of the amendment the counsel for defendants, in behalf of the Philadelphia & Reading Coal & Iron Company, moved for a continuance on the ground that it was taken by surprise and was unable to produce material evidence rendered necessary by the amendment unless time should be given for that purpose, and that the evidence which it was unable to produce, but which it believed it would be able to produce if the cause was continued, was that of five named witnesses and of others who would testify that Humphrey McCarthy was not a foreman of the Company at the time the accident complained of occurred; that he was an ordinary laborer and was not in charge of any of the men on the hoisting platform or any other part of the yard or dock. These grounds were set forth in an affidavit filed with said motion.

The court overruled said motion for a continuance over the objection and exception of the defendant Company, and also overruled a motion to strike out all testimony "going to show that Humphrey McCarthy was foreman." Thereupon the court also overruled the motion of the defendant Company for a peremptory instruction in its favor. Defendants' evidence was then heard, at the conclusion of which the defendant, Philadelphia & Reading Coal & Iron Company, renewed its motion for a peremptory instruction to the

jury to find said Company not guilty, which motion was again overruled.

The court instructed the jury to find the defendant, Michael M. Connery, not guilty, which instruction was duly complied with, when the verdict against the other defendant was rendered.

The court, at the request of the plaintiff, gave to the jury twelve other instructions, the giving of each of which is assigned for error, but to the first four of which only objections are urged in argument.

The first of these instructions states to the jury the allegations of counts hereinbefore referred to as A. and B. and states that the count we have denominated C. differs from B. only in alleging that the defendant Company was possessed of ''a mercantile institution, to-wit, a coal yard and dock,'' instead of alleging that it was possessed of ''a manufacturing establishment, factory or workshop.''

After the statement of the allegations of the declaration the instruction proceeds:

''Where it is alleged in the declaration that the defendants had notice of any fact, this means either that they actually knew it or that by reasonable care in view of the circumstances shown by the evidence they would have known it.

''The plaintiff is by law required to prove by a preponderance of the evidence the affirmative of the issue presented upon some one of these counts. If from a preponderance of the evidence you believe he has proved the affirmative of the issues presented by the pleadings, your verdict should be in favor of the plaintiff.''

The appellant claims in its argument (a) that ''the omission of any reference to the doctrines of assumed risk and fellow servants made this instruction erroneous.''

It also claims (b) that the instruction was erroneous "in submitting to the jury a question of law, viz: what a manufacturing establishment and a mercantile institution were," and (c) that it was erroneous in using the plural word "defendants" when treating of "notice," because at the time this instruction was given there was but one defendant in the case.

The second instruction states the provision of the law of this State that no child under the age of fourteen years shall be permitted or suffered to work at any gainful occupation in any mercantile institution or in any manufacturing establishment, factory or workshop, and then tells the jury that if they believe from a preponderance of the evidence that the defendant Company was possessed of "a mercantile institution," as alleged in count C., or of "a manufacturing establishment, factory or workshop," as alleged in count B., and "that the defendant the Philadelphia & Reading Coal & Iron Company, by its foreman in charge thereof, negligently and knowingly permitted and suffered the plaintiff to work therein at a gainful occupation, and that the plaintiff was at the time himself in the exercise of due and reasonable care for his own safety considering his age and experience, as alleged in said counts, and that by reason thereof the plaintiff was injured as alleged in said fifth or sixth counts of plaintiff's declaration, and that the plaintiff was then and there a child under the age of fourteen years, then the jury should find the defendant, the Philadelphia & Reading Coal & Iron Company, guilty."

The specific objection made by the appellant to this instruction is that it "submits an issue of law to the jury in requiring it to determine what was a mercantile institution."

The third instruction is substantially the same as the second, with the addition of an alternative to the de-

fendant Company's (by its foreman in charge thereof) "negligently and knowingly permitting and suffering" the plaintiff to work in its establishment, as follows: "or that plaintiff worked therein at such occupation in such manner and for such time that by the use of reasonable care defendant would have known thereof in time before the injury by reasonable care to prevent plaintiff from so working there."

This third instruction the appellant objects to not only on the same ground which it urges against the second, but also because, as it asserts, "there was no evidence tending to show that the defendant Company knew or could have ascertained that plaintiff was working for it."

The fourth instruction tells the jury "that the words 'manufacturing establishment,' 'factory' or 'work shop,' as used in the instructions shall be construed to mean any place where goods or products are manufactured or repaired, dyed, cleaned or sorted, stored or packed, in whole or in part, for sale or for wages and not for personal use of the maker or his or her family or employer."

The objection made by the appellant to this instruction involves a denial of the accuracy of the definition independently of statute, and the position that a statutory definition of the terms in question contained in an Act of the Legislature of 1897 is no longer in force, —the Act in question having been, as it is alleged, repealed by implication by a revision of the whole subject-matter by the Legislature in 1903.

Besides the peremptory instruction asked by the defendant Company, it tendered four others, which were refused. This refusal is assigned for error and the assignment is insisted on in argument.

The first of these refused instructions is as follows:

"The court instructs the jury that before the plaintiff can recover in this case under the amended fifth

and sixth counts of the declaration,'' (Counts B. & C.) ''it must appear from a preponderance of the evidence that the defendant, Michael Connery, knew that the plaintiff was employed by the car pushers to bring them beer or water.''

The refusal of this instruction was erroneous, appellant claims, because ''Michael Connery was the representative of the defendant Company and in charge of the dock, and it can not be that the legislature intended to mulct a defendant in damages unless knowledge of a violation of the statute was brought home to it.''

The second of the refused instructions was this:

''The Court instructs the jury that if you believe from the evidence the plaintiff was employed by car pushers and was on the premises for his own purposes, and if you further believe from the evidence that he was not on the premises for the purpose of doing anything beneficial to or in which the Philadelphia & Reading Coal & Iron Company was interested, then as to the amended third count'' (Count A.) ''of the declaration you will find the defendant, Philadelphia & Reading Coal & Iron Company, not guilty.''

The third was this:

''The court instructs the jury that Michael Connery was the only person who had authority to hire and discharge men at the coal dock in question, and unless the plaintiff proves by a preponderance of the evidence that said Michael Connery knew that the said plaintiff was employed on said premises, then you will find the defendant Philadelphia & Reading Coal & Iron Company as to the amended fifth and sixth counts'' (Counts B. & C.) ''of the declaration, not guilty.''

And the fourth this:

''The court instructs the jury that if you believe from the evidence that Humphrey McCarthy had no authority to hire or discharge men employed by the Philadelphia & Reading Coal & Iron Company, and if

you further believe from the evidence that he had no authority to admit or exclude people from the dock of the coal yard in question, then as to the amended fifth and sixth counts'' (Counts B. & C.) ''of the declaration, you will find the defendant, Philadelphia & Reading Coal & Iron Company, not guilty.''

Of these tendered instructions counsel for the defendant company say: ''Defendant's instructions two, three and four all should have been given. They were correct statements of legal principles and based upon the facts and theory of defendant's case.''

The ''theory of defendant's case'' alluded to is stated in other parts of appellant's argument to be that plaintiff was a mere licensee upon the premises of the defendant Company, and that no wilful injury was claimed; that consequently appellant could not be liable under count A., and that the Child Labor Act of Illinois, on which counts B. and C. are based, affects the liability of a defendant for an injury to a minor under the prohibited age who is working in or about the defendant's premises only when the relation of master and servant exists between such defendant and such minor.

The jury returned a verdict simultaneously finding the defendant, the Philadelphia & Reading Coal & Iron Company, guilty, and the defendant, Michael M. Connery, not guilty. (Rec. 56.)

The defendant Company filed a written motion for a new trial, specifying as grounds for the same that the verdict was against the law and the evidence; that it was not sustained by the evidence; that the damages were excessive; that the court erred in not giving a peremptory instruction in favor of the defendant Company; that it erred in ruling upon evidence, in giving and refusing instructions and in overruling the defendant's motion for a continuance, heretofore described.

The assignments of error in this court repeat these complaints and add allegations that the court erred in overruling the motion for a new trial and the motion in arrest of judgment, and in entering judgment on the verdict.

The facts developed by the evidence were these:

The defendant corporation at the time of the accident was a coal mining and coal selling corporation. It mined coal in Pennsylvania, brought it in vessels to a dock and coal yard in Chicago and here sold it. In the yard the coal was cleaned, screened, stored, and from the yard it was sold and hauled away. In this yard at the edge of the river about 35 feet above the water was a platform about 22 feet wide and about 200 feet long. From the platform eight or ten runs with tracks upon them extended back on the same level to the coal bins in the storage sheds. On the edge of the platform were three masts, each with a boom, about 30 feet long and a foot in diameter attached, on which booms, blocks and falls were rigged, and by means of these derricks the coal was unloaded from vessels lying at the dock, of course by the means of steam power. Buckets were lowered into the holds of the boats, filled, hoisted to the platform, swung in and dumped into small coal cars standing on the platform. These cars were then pushed by men along the platform and along tracks on the runs to the storage bins and dumped. This work had been carried on for at least sixteen years in that way. At the time of the accident involved here there were fourteen or fifteen men hoisting, dumping and pushing cars on this platform. Other men were at work in the vessel which was unloading. The platform was occupied by workmen only when a boat was unloading, which, however, as the yard was a large one (sometimes as many as sixty men being engaged in it in loading cars and wagons), must have been frequently. It had been for at least sixteen years

customary for the men on the platform working at the dusty business of hoisting, pushing and dumping anthracite coal to have "a water boy" to bring them water in cans or tin buckets from a hydrant in a barn next to the office in the yard. The water would be drawn into cans at the hydrant, taken by the water boy up 'a pair of winding stairs, then along a pair of planks to the "runs" and along the "runs" to the platform. The men employed on the platform paid the boy according to an agreement they, might make with him and among themselves. This payment was made when the men themselves received their pay for the hours they had worked on the unloading job, and for many years (one witness says eighteen) these "water boys" were paid by men outside the office door.

There is evidence that the plaintiff when engaged in the carrying of water as "a water boy," as hereinafter described, also carried beer at times to the men on their special order, the men giving him the money to buy it outside the yard.

In argument to the court below, as shown by the bill of exceptions, counsel for the defendant Company said: "Besides bringing water he was there for the purpose of bringing beer. That is really why the boy was there. * * * We didn't want to have beer on the premises, but under the Union rules the men say they are entitled to it and we would have a strike on our hands if we refused to let them have beer."

This statement was repeated in the oral argument of the cause in this court. No evidence on the position taken or rules made by the Company on this subject was introduced, however, by either party.

October 6, 1903 the plaintiff, John Purtell, was between eleven and twelve years old and a school boy. As he was going along through or to a street (Lumber street), which runs through the coal yard, a man who was pushing a car on one of the runs called down to him

and asked him if he wanted a job ''for a couple of days, until the boat is out.''    Either the character of the ''work'' was mentioned (which does not appear from the evidence), or the boy knew it from previous observation, for he went home, procured a couple of cans and went back to the yard and platform.    Some of the men showed him where to get the water, and he worked that day and part of the next.    He brought water in cans, medium sized dinner buckets, and would place them on an unused part of the platform at the south end and, as he testified, ''Some of the men would be at the end of the shed and some men would be hoisting, and they couldn't all get a drink at once.    They would come one at a time and generally from the south end of the platform.    I had some cans full of water, and whenever they wanted a drink they would call me and I would hand them the can.    Some fellow up there would beckon me and I would go over and see what he wanted.    I would go along the platform, not out on the run.    When I was not actually carrying water I sat down on a bench back enough from the end of the platform so I would not get hurt.    I came back out of the way of these fellows,—away in the corner where there was a bench where you could sit down.''

It appeared from the testimony of one witness (Vogt) that the plaintiff brought ''water principally'' to the men.    Another witness (King) said that he fetched him (King) beer two or three times a day, and that he saw him bring other men beer, but he did not know how often and could make no estimate of the comparative amount of time plaintiff occupied in bringing the two beverages respectively.

The bench on which the plaintiff sat was at the west end and at about the middle of the width of the platform.    While he was sitting there, putting his pails together, a boom upon one of the masts swung around and the block attached to the fall, made of wood and

metal and weighing about fifty pounds, struck the
plaintiff in the back and knocked him over the plat-
form twenty-five feet or more to the deck of the boat
below.    The injuries he received will be hereafter de-
scribed.

Of the three derricks or masts with booms attached
before mentioned only two were in use on this day.
The westerly one, the one nearest therefore to where
the plaintiff sat when at rest, was the idle one.    There
was a strong wind blowing.    "It was a very windy
day," one of the witnesses testified.    The boom on
this idle mast had been tied in the morning by one
Humphrey McCarthy, an employe of the defendant
Company (whose status as such employe is a matter
of dispute), to a post of the shed.    It was tied by a
marline string attached to the fall, McCarthy says.
A marline string is a strand out of the end of a rope
such as is generally used to wind around ropes and
cables to keep them from fretting.    It is described
by one witness as "a raveling of the rope—a piece of
string about the size of a lead pencil," and by still
another as "old and worn and about the size of a lead
pencil."

The boom had been noticed by this witness before
that time swinging to and fro four or five feet.    The
string was evidently not strong enough to hold the
boom in the wind.    It broke between the fall and the
post, and the block swung out about thirty feet and
struck the plaintiff in the back as stated.

The injuries which plaintiff received were very se-
vere—perhaps not overstated by the plaintiff's coun-
sel in the proposition of his argument that to his arms
they were the most severe that could happen short of
amputation of both of them.    They were a double
compound comminuted fracture of both forearms in
the neighborhood of the wrist and a fracture at the
elbow of the ulna besides.    The wounds were infected
and the patient suffered great pain for a year, during

which he was in the Cook County Hospital and for two or three months thereafter.    At the end of that time the wounds healed.    There were two operations, the first immediately after the plaintiff's removal to the hospital.    After that the arms were placed in casts which had to be removed because of the infection after some weeks.    The wounds were then dressed for six or seven months, and then a further operation was necessary.    After this the wounds were dressed again until they finally healed.    The permanent deformity of the arms and the effect upon the use of the arms and hands is also great.    The right wrist is absolutely ankylosed, and is immovable.    Both arms are shortened and deformed, the hands are smaller than normal, growth having been interfered with.    There is some motion in the left wrist, but it is abnormal. In the right arm the ulna does not articulate with any of the bones of the wrist.    The grip of both hands is small.    The fingers can only be brought down to touch the palm without closing solidly.    There is no hope of improvement, and at the time of the trial six years after the accident, the plaintiff kept straps on both wrists to strengthen them and a bandage on his right hand to keep the strap from cutting it.

The stress of the defence in this case is placed on the proposition that there was no evidence under any of said counts warranting a verdict, and that in consequence a peremptory instruction for both defendants should have been given.

To first discuss this contention as a whole will decrease or altogether dispense with the necessity of detailed comment on the subsidiary questions raised concerning the instructions which were given and the rulings on evidence.

As to count A., the proposition rests on the claim that plaintiff was a mere licensee, to whom the defendant Company was under no other duty than to abstain from wilfully injuring him, and the alternative claim

that if he were in any sense an employe, and thus more than a licensee, the negligence proven, if any, was so clearly that of a fellow servant that the court should have so held as a matter of law.

We cannot agree with either of these conclusions. The facts above detailed show clearly, to our mind, that for many years there was a custom, which must have been well known to the persons responsible for the conduct of the defendant's plant for the "car pushers" and others in their very exacting and dusty work of handling coal, to employ a "water carrier" who should keep them all supplied with this necessity of their situation and who sometimes also was expected to go for beer at the behest of individuals who might especially entrust him with that errand.    It would seem probable that this custom, if it may be so called, of these "water boys" sometimes carrying beer which, as defendant claims in argument was insisted on by the workmen's union as a right, the denial of which would precipitate a strike,—tends to explain why the Company, desiring not to be the active factor in furnishing the beer, but desiring equally to avert a strike, allowed the practice to grow up, which was unequivocally proven, of allowing the men to employ and pay the "water boys" rather than to engage them itself.    However this may be, the knowledge of the defendant Company of the custom, existing for years, and the consequent implied invitation of the Company to the plaintiff to come on its premises, seems to us well established.    We think this deduction from reason is fortified also by authority in this State.    Atkins v. Lackawanna Transportation Company, 182 Ill. 237; Illinois Central R. R. Co. v. Hopkins, 200 Ill. 122.

The citations made by defendant's counsel from other courts are not of equal authority, and we think, moreover, have been successfully distinguished by the plaintiff in his argument.

We do not think, on the other hand, that the point made by the defendant that the "water boy" in its yards was a "luxury" and not a "necessity," and that therefore the cases above cited from the Supreme Court of Illinois are not controlling, is well taken. The theory that each man engaged in dumping and pushing cars on the platform could, without objection from his employer, go over the runs, down and up stairs and back over runs to his work again whenever he needed a drink, or even when he wanted to fill his pail, to be set at some safe distance on the platform from his work and resorted to on occasion, does not appeal to us as reasonable. At all events, it was not the system adopted, and the Company will be held by us to have, with full knowledge or means of knowledge, tolerated and encouraged another method. We hold that the plaintiff was an invited person in the defendant's yard, doing work there with its consent and knowledge. Under these circumstances we also hold that the use by the plaintiff of the platform and of that part of it occupied by him when he was struck, and the manner of the said use was both "acquiesced in" by the defendant Company, and was "in accordance with the intention and design with which the place was adapted and prepared or allowed to be so used." Therefore, the defendant Company "assumed an obligation that the premises were in a safe condition, suitable for such use, and for a breach of this obligation was liable in damages to a person injured thereby." We have quoted this language from the opinion of Chief Justice Bigelow of Massachusetts in the case cited by appellant as a leading one—Sweeny v. Old Colony and Newport Railroad Company, 10 Allen, 368.

We think it was negligence to leave, in a high wind, the block and the boom from which it hung so unsecured or insufficiently secured that it was likely to swing out over a considerable arc and do the mischief

complained of here.    Nor do we think it can be suc-
cessfully urged that it was the negligence of a fellow
servant of the plaintiff.    Even assuming—contrary
to. the contention of the defendant, so vigorously
pressed in other divisions of its argument—that the
plaintiff by being employed by the defendant's em-
ployes became in a sense an employe of the defendant,
a "sub-employe," as the plaintiff contends, it does not
follow that the negligence complained of was the neg-
ligence of a fellow servant.    The duty which the law
imposed on the defendant Company to the plaintiff on
inviting him to do his work on its premises, is de-
scribed by count A. of the declaration to be "to furnish
the plaintiff a reasonably safe place in which to per-
form said work."    This is a primary duty, not to be
delegated and to which the fellow servant doctrine
does not apply; and the declaration therefore prop-
erly, on the plaintiff's theory of the case, charged the
default to be that of defendant and omitted any aver-
ment that the negligence complained of was not the
negligence of a fellow servant.    Himrod Coal Co. v.
Clark, 197 Ill. 514; Libby, McNeil & Libby v. Scherman,
146 Ill. 540,. 549.

The negligence was originally described in count A
of the declaration as follows: "the defendants *   *   *
suffered the said derrick, booms and tackle, which were
not then and there in use for hoisting to remain not
reasonably securely tied or fastened," and this was
still the gist of the negligence charged after the alle-
gation had been amended by adding to it the words
(describing more particularly the exact condition of
the tackle) "but on the contrary fastened insecurely
with a weak, insecure, worn out and rotten fastening,
which was very liable to come loose at any time."
The real negligence was not in fastening it in any man-
ner; it was in leaving it insecurely fastened.    This
the defendant did, nor does. it appear that such fasten-
ing as Humphrey McCarthy did, or such as he ought

to have done if he did any, was in the especial line of his duty. If we are to accept the position strenuously, contended for by the defendant, he was a mere laborer; but even if he were a foreman, as he himself swore and the plaintiff contends, and if a foreman was a fellow servant of the "water boy," the defendant cannot avoid its liability by any theory which devolved solely upon such foreman "the use of reasonable care to keep the platform a reasonably safe place to work on."

Nor do we think that the doctrine of assumed risk has any place in this case. Count A of the declaration alleges that the "plaintiff by reason of his inexperience and tender years was unaware of and did not appreciate the said risk of injury," and this was one of the allegations recited in the first instruction of the court, as to which the jury were told the plaintiff must prove his case by a preponderance of the evidence.

The theory that plaintiff was guilty of "contributory negligence" or "assumption of risk" is untenable. The jury would not have been justified in so finding. The plaintiff, without reference to his youth even, would have had no duty of inspection, but only of observation.    Illinois Steel Co. v. Mann, 100 Ill. App. 367.

We hold that the peremptory instruction was properly refused and that it would have been properly refused had count A. stood alone in the declaration, and as we hold further, as can be seen from the resume of facts which we have given and from what we have hereinbefore said, that the jury were justified in finding the issues for the plaintiff on this count, it becomes of less importance to discuss counts B. and C., and the liability of the defendant corporation under their allegations. But as they are involved in the errors assigned as to instructions, we will advert to them. These counts depend on the Child Labor Act of Illinois, and if they are good and sustained by the

evidence they removed from the jury, under the doctrine of our Supreme Court in Strafford v. Republic Iron and Steel Company, 238 Ill. 371, expressed in the case at bar by the trial judge in his 2nd and 3rd instructions, any question of the negligence of either plaintiff or defendant, except the negligence of the defendant company's "permitting and suffering" the plaintiff, who was under fourteen years of age, to work on its premises. These two instructions, however, leave to the jury the question whether the defendant corporation was possessed of either "a manufacturing establishment, factory or workshop" or "a mercantile establishment"—these being the descriptions of the defendant's yard where the accident occurred, respectively given in the counts B. and C., to bring it within the provisions of the Child Labor Act.

The appellant's claim that this was injurious error to it is unfounded. It may indeed have been hardly a question for a jury, considering the evidence. There could be no reasonable answer to it but in the affirmative, in both its branches.

And, indeed, by the fourth instruction which he have hereinbefore recited, the trial judge, in view of the fact that there was no contradiction in the evidence that "products" (to-wit, coals) "were cleaned and stored" in the yard, must be held to have informed the jury that they must hold that yard to be "a manufacturing establishment, factory or workshop." He was justified in doing so.

The Act "To regulate the employment of Children in the State of Illinois," approved June 9, 1897, by its 8th section expressly declares that the words "manufacturing establishment, factory or workshop, as used in this Act shall be construed to mean any place where goods or products are manufactured or repaired, dyed cleaned or sorted, stored or packed, in whole or in part, for sale or for wages, and not for the personal use of the maker or his or her family or employer."

We are of opinion that this section of the Act of 1897 is still in force and, moreover, although it applies by its strict terms only to that Act, it must be considered as furnishing a definition for the same words in the similar revising Act of the same title, approved May 15, 1903.

The evident purposes of the Act of 1903 are better to define the extra-hazardous occupations from which by the Act of 1897 the legal employment of youths between fourteen and sixteen were withdrawn, to provide further conditions in the nature of prior school attendance and teaching in case of the employment at all of such persons, to shorten the hours allowed for children's work, and to provide more efficient machinery for the enforcement of the Act. The Act of 1903 was in nowise intended otherwise to repeal or conflict with the law of 1897, and while expressly repealing a Child Labor Act of 1891, it does not mention the Act of 1897. Nothing is better settled in the construction of statutes than the rule thus stated (with citations) in the American & Eng. Ency. of Law: "Statutes," vol. 26, p. 611: "Words in a subsequent Act are to be given the recognized meaning they had in a former Act *in pari materia* in the absence of anything to show a contrary intent."

But if there were any doubt on the question whether the defendant's coal yard were "a manufacturing establishment, factory or workshop," there would be none that it was "a mercantile institution." It is certainly an "institution." "Mercantile" is defined by the Century Dictionary and by Webster's alike as "pertaining to trade," "commercial." How a coal yard, to which great quantities of coal mined by its owner, are brought, in which they are stored and from which and in which they are sold, can escape the definition of a mercantile establishment, we cannot see.

There is, however, a question raised by the appellant more serious than those above mentioned, as to

the application of the Child Labor Act to the case at
bar and, consequently, as to the sufficiency of the
counts B. and C. and as to the accuracy of the first
three instructions.    The appellant contends that the
Child Labor Act does not so apply in personal injury
cases as to bring a case like the one at bar within the
doctrine of the Strafford case (*supra*) and of the in-
structions of the trial judge in this case, that any in-
jury received by a child within the prohibited age
which can be traced to his being unlawfully ''em-
ployed, permitted or suffered to work'' in the ''mer-
cantile institution'' or ''manufacturing establish-
ment,'' ''factory'' or ''workshop'' of the defendant,
renders the defendant liable without reference to his
negligence or to the care of the plaintiff.    It insists
that to bring a case within this doctrine there must be
an *employment* by the defendant; that, in other words,
the relation of ''master and servant'' must exist be-
tween the defendant and the plaintiff.    This conten-
tion is urged and resisted strongly by the respective
parties in this case.

The first section of the Act of 1903 provides ''that
no child under the age of fourteen years shall be em-
ployed, permitted or suffered to work at any gainful
occupation * * * in any mercantile establishment,''
etc.

We think that the better reason would seem to be on
the side of the position that in supplementing the word
''employed'' with the words ''permitted or suffered''
in this first section of the Act, the Legislature intended
to place on the proprietors of an establishment like the
one involved here, the responsibility of keeping out of
any laboring function on his premises a child within
the prohibited age.    If this be so, the same doctrine
in regard to liability for injuries received by one
wrongfully ''permitted'' or ''suffered'' to work by a
defendant should prevail as is applied to one who is
wrongfully ''employed'' to work by him.    Such a con-

struction of similar Acts has been adopted by English and other courts, and, in the absence of any decision on the question by the Supreme Court of Illinois, is the one which we prefer to give.    It tends to the evident purpose of the Act—the protection of children of tender age from dangers to which they ought not to be subjected.

We are not deciding in this case that the accidental presence of a child in a proprietor's establishment, and his incidentally engaging in some work there, will necessarily render the proprietor liable for any injury the child may happen to receive on the premises.  This case, even in the aspect we are now discussing (relating to liability under counts B. and C.) does not call for any decision wider in its scope than the statement that the relation of master and servant need not have technically existed between the defendant and the plaintiff herein, to render the defendant liable.    The long continued custom, the reasonable necessity by the laborers for frequent draughts of water or other liquid during their particular work, the fact that plaintiff had been carrying on his auxiliary or subsidiary employment for a day or more in places where, in the ordinary course of business, accredited representatives of the defendant would naturally have seen him, are all to be considered, and, by the complained of instructions which relate to these counts, were impliedly and practically brought to the attention of the jury.    It was only in case they believed from the evidence that the defendant *"negligently and knowingly* permitted and suffered the plaintiff to work,'' etc., or in case they believed from the evidence that plaintiff worked on the premises of the defendant ''in such manner and for such time that by use of reasonable care defendant would have known thereof in time before the injury by reasonable care to prevent plaintiff from so working there,'' that they were to find the defendant guilty on counts B. and C. of the declaration.

We do not think that the instructions incorrectly stated the law or are obnoxious to the objections urged against them.

The refusal of the instructions tendered by the defendant was, under the views that we have expressed, justified. They proceeded upon a fallacious theory. They would have been misleading. The question involved needed for its solution the consideration of other factors than those to which the refused instructions called attention. They are the things immediately hereinbefore mentioned as impliedly or practically presented to the jury by the instructions which were given and are attacked. It is not our opinion that the Company could become liable only through the knowledge of Michael Connery, or that counts B. and C. are so framed as to make such knowledge indispensable to liability under them.

Our conclusions already expressed leave for consideration, except as to the amount of the damages assessed by the verdict, only the alleged errors in the admission of evidence and in the denial of a continuance on the amendment of the declaration at the trial.

We do not think they are well assigned. It certainly was material and relevant to the issues involved to show the usual and long continued habit of the men in the yard about a "water boy." It threw light, not on the knowledge of the age of the plaintiff, but on the relations between the plaintiff and defendant and of the probable knowledge by the defendant of the capacity in which the plaintiff was acting and its implied permission therefor. The use of the word "custom" in connection with it did not render it any more objectionable than had the term been "practice" or "usage."

Once the knowledge, permission and approval of the defendant corporation as to the presence of the plaintiff on its premises and his labor thereon in a gainful occupation, were established, the age of the child be-

came a matter which it must ascertain at its peril American Car Co. v. Armentraut, 214 Ill. 509.

The denial of the continuance prayed for when the amendment of the three counts was made eliminating the statement that Connery was "foreman" as well as "superintendent," and adding the allegation "that one Humphrey McCarthy was then and there in the employ of defendant as foreman of the said yard under the said Connery," was a matter of judicial discretion.    It would not have been error to allow the motion, and it was not error, in our opinion, to deny it.

The amendment does not seem to us one that it was necessary to make.    It was apparently done in fear of a variance, after there had been testimony that McCarthy was "foreman."    We do not think there would have been any material variance had the declaration remained unaltered.    We think that under the declaration as it stood, the plaintiff was entitled to show either express notice to an agent or to agents of the Company of his presence and occupation, or to show, as one of the given instructions, as previously recited, puts it, "that plaintiff worked on the Company's premises at a gainful occupation in such manner and for such time that by the use of reasonable care the defendant would have known thereof in time to prevent the accident."    In this view we do not think it was reversible error to refuse to continue the cause to allow defendant to procure witnesses to contradict the assertion of McCarthy that he was "a foreman."

The amount of the verdict has given us much thought.    Terribly severe as the injuries were in their immediate and temporary effects, they were greatly more important even in their permanent ones.    We do not think the size of the verdict can be necessarily or even probably attributed to "passion or prejudice."    Therefore large as we deem the verdict— larger than we should have preferred to see it—we will

not undertake to say that it is so excessive as to demand reversal and remandment.

The judgment is therefore affirmed.

*Affirmed.*